UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | Court File No. 17-cr-282 (MJD/LIB) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Donald Wayne Yellow, | |
| Defendant. | |

---

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636 and Local Rule 72.1, upon Defendant Donald Wayne Yellow's ("Defendant") Pretrial Motion to Suppress Statements. [Docket No. 24]. The Court held a motions hearing on January 3, 2018, regarding the Defendant's pretrial motions.[1] At the motions hearing, the parties requested the opportunity to submit supplemental briefing, which was completed on January 18, 2018, and after which Defendant's Pretrial Motion to Suppress Statements, [Docket No. 24], was taken under advisement.

For reasons discussed herein, the Court recommends that Defendant's Pretrial Motion to Suppress Statements, [Docket No. 24], be **DENIED**.

I.   BACKGROUND AND STATEMENT OF FACTS

   A.   Background

Defendant is charged with two counts of aggravated sexual abuse of a child under twelve (12) years of age, in violation of 18 U.S.C. §§ 1151, 1153(a), 2241(c), 2246(2)(A), 2246(2)(D), and 3359(e). (Indictment [Docket No. 12]).

---

[1] The Court addressed Defendant's pretrial motions for discovery and production of evidence by separate Order. [Docket No. 29].

**B. Facts**

The record presently before the Court indicates that on October 10, 2017, Defendant was arrested pursuant to a pending federal arrest warrant, and he was transported to the Red Lake Law Enforcement Center. (January 3, 2018, Motions Hearing, Digital Recording at 2:11–2:13 p.m.). Upon arriving at the Red Lake Law Enforcement Center, but before being booked into the Red Lake Detention Center, Defendant was met by Federal Bureau of Investigation's Special Agent Zane Nevala ("SA Nevala"), and Defendant was directed into the front passenger's seat of a Special Agent Justin Montgomery's ("SA Montgomery") SUV which was parked in the Red Lake Law Enforcement Center parking lot. (Id. at 2:11–2:18 p.m.).[2] SA Nevala sat in the front driver's seat of the vehicle while SA Montgomery and Red Lake Criminal Investigator Paul Kwako ("CI Kwako") sat in the back seat of the vehicle. (Id. at 2:03–2:05 p.m., 2:15–2:17 p.m.).

SA Nevala then began interviewing Defendant.[3] SA Nevala recorded the interview. At the time of the interview, SA Nevala testified that he was dressed in his typical civilian attire including a pair of jeans and a shirt. (Id. at 2:08–2:09 p.m.). SA Nevala also testified that he had no issues understanding Defendant, that Defendant responded appropriately to questions asked, that Defendant appeared "normal physically," that Defendant did not appear to be under the influence of any drugs or alcohol, and that Defendant seemed psychologically fine without any indication of mental health disabilities although he became a bit emotional at times. (Id. at 2:05–

---

[2] SA Nevala testified that he could not specifically remember why he conducted the interview in the vehicle as opposed to inside the Red Lake Detention Center. (Id. at 2:14–2:17 p.m.). SA Nevala thought it might have been because the officer wanted to talk with Defendant before he was booked, because it was late in the afternoon, or because there were no rooms available at the time in the detention center; however, he could not recall if the officers checked for available interview rooms. (Id.).

[3] SA Nevala testified that he had information about Defendant before he interviewed Defendant, including Defendant's criminal history and date of birth, and that he knew Defendant had previous contact with the criminal justice system. (Id. at 2:05–2:06 p m.). Before the interview, SA Nevala also had previous information about the alleged victims in the present case as he had observed the interviews of the alleged minor victims. (Id. at 2:19–2:20 p.m.).

2

2:06 p.m., 2:08–2:09 p.m., 2:20–2:21 p.m.). SA Nevala also testified that Defendant remained handcuffed with his hands in front of him during the interview. (Id. at 2:13–2:14 p.m.).

SA Nevala began the interview by informing Defendant that he believed CI Kwako had already discussed Defendant's rights with Defendant, but SA Nevala would be going over them again. Specifically, the following exchange took place:

> SA Nevala: I'll read this quick and have you sign it. It's the same thing, just federal form here.
>
> [Reading Form] Before we ask you any questions you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions. If you can't afford a lawyer, one will be appointed for you before any questioning, if you wish. If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.
>
> At the bottom here it says: I've read this statement of my rights and I understand what my rights are. At this time I'm willing to answer questions without a lawyer present.
>
> Do you have any questions on that or do you understand what I've just read?
>
> Defendant: I understand.
>
> SA Nevala: Just sign right there.

(Gov't Ex. 1 at 0:00–1:30).[4] Defendant then signed the Advice of Rights form, and the form was witnessed by SA Nevala and SA Montgomery. (Gov't's Ex. 3).[5]

After Defendant signed the Advice of Rights form, SA Nevala began discussing various topics with Defendant, including Defendant's current address; Defendant's residence history, as

---

[4] Government's Exhibit 1 is a CD audio recording of the October 10, 2017, interview. At the motions hearing, the Government, without objection, offered the CD audio recording into evidence as Government's Exhibit 1. (January 3, 2018, Motions Hearing, Digital Recording at 2:07–2:08 p.m.).

[5] Government's Exhibit 3 is the Advice of Rights form signed immediately prior to the October 10, 2017, interview. At the motions hearing, the Government, without objection, offered the Advice of Rights form into evidence as Government's Exhibit 3. (January 3, 2018, Motions Hearing, Digital Recording at 2:07–2:08 p m.).

well as, who lived with him; which children lived with him; and Defendant's parole history. (Gov't Ex. 1 0:00–4:02). When asked if Defendant knew why the officers were speaking with Defendant, he acknowledged that he knew, but he didn't understand why they were not speaking to a foster child who Defendant asserted could be the one sexually assaulting the alleged child victims. (Id. at 4:00–7:45, 27:50–31:05). SA Nevala explained to Defendant that the alleged child victims had been interviewed, and the children had said that Defendant was the one who had sexually assaulted them. (Id. at 8:00–10:30). SA Nevala and Defendant's then discussed Defendant's prior sexual assault conviction in federal court, the weight a victim's testimony could carry in a trial, and Defendant's history of being sexually assaulted as a child. (Id. at 10:30–14:05). Defendant repeatedly asserted that the "kids" just wanted him out of the house, and that Janet[6] probably told the "kids" what to say to law enforcement in an effort to get Defendant out of the home. (See, e.g., Id. at 14:05–15:18, 17:01–18:05, 25:50–26:10, 38:45–40:40). Defendant also repeatedly asserted throughout the interview that the alleged child victims' grandfather, Steve, was inappropriate around the children and encouraged their inappropriate dressing. (See, e.g., Id. at 15:18–17:01).

After Defendant discussed the circumstances of his prior conviction, SA Nevala explained to Defendant, that with his prior conviction, he was now looking at a possible life sentence in the present case. (Id. at 17:05–23:05). Defendant responded that they would probably send him back to prison, but he would rather be dead than spend life in prison. (Id. at 23:10–24:45). SA Nevala explained that the children had provided detailed testimony—which SA Nevala had no reason to disbelieve—and when combined with Defendant's previous conviction, things "didn't look good for" Defendant. (Id. at 26:30–34:05). SA Nevala also said that, while

---

[6] Janet appears to be the adult daughter of the woman with whom Defendant was living.

under the circumstances Defendant could be looking at a life sentence, he could benefit from just telling the truth. (Id. at 34:10–40:33).

SA Nevala and CI Kwako then stepped out of the vehicle. (Id. at 40:33–41:05).[7] While SA Nevala and CI Kwako were outside, Defendant was permitted to place a phone call to Olivia—the woman with whom he was living—to describe what was happening and where he would be going. (Id. at 41:05–43:20). When SA Nevala reentered the vehicle, Defendant stated that it was "fucking hot" to which SA Nevala responds "yeah, it is kind of warm." (Id. at 43:20–43:35). SA Nevala then started the vehicle, and he turned on the air condition. (Id. at 43:35–44:03).

After turning on the air conditioner, SA Nevala again began discussing the benefits of Defendant's being honest and explaining the situation. Specifically, the following exchange took place:

> SA Nevala: Donald, typically, you know—and prior to coming to Red Lake I worked mostly violent crime and drug cases. And I'll give you an example of a drug case and the way that the federal system works. You said it hadn't really been explained to you before, but—and typically say we arrest a guy and he's looking at twenty years to life, forty years to life because we caught him with five pounds of meth or 10 pounds of meth. Now, he can say—you know, I can sit down and try to talk to him and he can say, you know, "get lost. I'm going to go to court, go to trial, you know take my chances," and whatever. And if he gets convicted, he's going to go away for whatever he's—the guideline range is twenty to life forty to life, somewhere along those lines.
>
> Now, what I always do is sit down with them and say look explain the way the system works and give examples of reasons why you would want to come clean, do the right thing, cooperate versus going to trial. Okay?
>
> Defendant: Uh-huh.

---

[7] If a conversation took place between SA Nevala and CI Kwako outside of the vehicle and away from Defendant, that conversation was not recorded.

SA Nevala:   And every case, every situation is a little bit different, but on one hand, you're looking at set guidelines and your criminal history. That is what it is. But the other thing—you know, on the other hand, rather than going to trial and, you know, taking the chance of losing, you know, if you decide to come clean and do the right thing, well, at that point, you know, I can tell the prosecutor that, look, you know what? Donald—this is what happened to Donald when he was a kid. This is what happened in this case with these kids. But Donald did the right thing. He explained the situation to what happened. And there's consideration given in that instance, you know, because the prosecutor is going to look at it and the judge when it comes time to do sentencing is going to look at the information and say, look, a bad thing happened to Donald when he was a kid. A bad thing happened when Donald was around these kids. But on the plus side, Donald came clean and explained, you know, his actions and the reasons for it. Now, it doesn't mean that you're going to go walk free and not do any time in jail, but you have a chance in that situation to have a substantially reduced sentence versus a life sentence. And that's not—at the end of the day its completely up to the judge and the judge can say no, I'm not going to give Donald any consideration and throw the book at you. But typically what happens is, you can have someone that's looking at a twenty to life or forty to life charge and they decide they're going to do the right thing, come clean. And not only does that help the person, but it helps us with the case, obviously, because we don't necessarily want to go to trial. We will if we have to. But a lot of times there's other victims out there. There's other people out there that are doing this to other kids that—there's information out there that is helpful to us, you know. So you can not only help us, you can help yourself. You can help us. And typically in a lot of cases, you know, when we have guys that are—you know, in—for example, in drug cases, we've had guys that were looking at whatever, ten years, twenty years, and they decide hey, we're going to do the right thing and cooperate. And from that point forward we might work with them as far as getting other guys off the street or they tell us about other guys that are out selling dope. And when it comes down to sentencing time, you know, they may have a significantly reduced sentence, five years, ten years, or in some case—and I'm not saying that this would happen with a case—a child sex case like this, but you know, we've had guys that were facing significant amounts of time that cooperated, did the right thing and helped us get other guys off the street that didn't do a day in jail. And I'm not saying that's going to happen in your case because chances are, no matter how this goes, you're probably going to end up doing some time in jail. But I—I would say, on this end you've got a chance of doing some

6

>           time significantly less than life. On the other hand, you go to trial and you lose, you're looking at a life sentence—and I think—you know, I can't put words in the judge's mouth, but I think if the judge is looking at the case and saying, you know what? Donald said pound sand. Fuck you, guys. I'm not going to take a polygraph. I'll go to trial and then loses, you know, that's what you have on one hand. On the other hand, if you say, you know what? This is the situation Donald was in. He did the right thing. He came clean, you know. And now it comes time for sentencing, which one looks better, you know.
>
> Defendant:    Twenty years ago they wanted me to say something that I didn't do.
>
> SA Nevala:    No, I don't—actually, absolutely not, I don't want you to say something you didn't do. What I want you to do is be truthful with us, with me. That's it, you know, nothing more than that. I don't want you at all to say something you didn't do.

(Id. at 44:03–50:19). Defendant and SA Nevala continued to discuss the benefits of telling the truth, and Defendant stated that he didn't know what to say because he was not believed when he was sexually assaulted as a minor. (Id. at 50:20–53:20). SA Montgomery then told Defendant the officers were there "to hear your side of the story." (Id. at 53:20–54:12).

For the first approximately fifty-four minutes, Defendant denied any lone interaction with the children; Defendant then admitted at least some solo interaction with the children which "tempted" him; he discussed circumstances surrounding his interactions with the alleged child victims; he continued to allege that the children's grandfather, Steve, acted inappropriately around the children and made them dress inappropriate; he discussed how he was sexually assaulted as a minor and no one believed him; he continued to discuss the circumstances of his prior conviction, as well as, his misgivings with that investigation; and Defendant denied having any sexual activity with the alleged victims. (Id. at 54:12–1:33:05). SA Nevala and Defendant also discussed Defendant's mobile telephones, and Defendant gave law enforcement permission to search his mobile telephones. (Id. at 1:33:05–1:36:57).

SA Nevala then began concluding the interview by asking Defendant if he had any questions to which Defendant responded "no." (Id. at 1:36:54–1:36:58). SA Nevala explained that Defendant was going to be booked in the Red Lake Detention Center, and Defendant stated he was scared to go in there. (Id. at 1:36:58–1:37:17). The officers then told Defendant that they would inform Olivia and Defendant's brother for him of Defendant's next hearing time. (Id. at 1:37:17–1:42:15). Defendant then asked if he could call his brother. (Id. at 1:37:30–1:38:20). SA Nevala told Defendant he could call his brother, and Defendant did so. (Id.). Defendant then began crying and saying that he didn't want to go through this again because everyone at the Red Lake facility would know of what he was being accused. (Id. at 1:38:30–1:43:10). SA Nevala explained that the federal officers would return in a day or two to take Defendant to a federal judge, and SA Nevala asked Defendant if he was going to do anything to harm himself to which Defendant responded "no"; he just didn't want to be around anyone. (Id.). SA Nevala then verified that Defendant didn't have any other phones or computers at his residence, reminded Defendant that SA Nevala would be returning, and he concluded the interview with Defendant. (Id. at 1:43:10–1:44:28).

Throughout the interview, the officers maintained a conversational tone without raising their voices or threatening Defendant. Although Defendant became somewhat emotional at times when discussing his deceased father, his past sexual abuse, and his present circumstances with his brother, Defendant also maintained a conversational tone, and he was cooperative throughout the interview. Defendant also responded appropriately to the questions presented.

**II.  DEFENDANT'S MOTION TO SUPPRESS STATEMENTS. [DOCKET NO. 24].**

Defendant now moves the Court for an order suppressing the statements he made during the interview on October 10, 2017. (Def.'s Mot. to Suppress Statements [Docket No. 24]).

8

In his memorandum in support of the present motion, Defendant contends that the officers were required to provide him with a Miranda[8] warning before interrogating him, and that he did not provide a valid waiver of his rights prior to the interrogation. (Def.'s Mem., [Docket No. 31], at 4, 8). Therefore, Defendant argues, the statement he made on October 10, 2017, should be suppressed. (Id.). Defendant also argues that even if his initial waiver is found to be valid, Defendant's interrogation became impermissibly coercive when his will was overcome which rendered his waiver and statements involuntary. (Id. at 4–8).

### A. Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Accordingly, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). "Interrogation under Miranda includes not only express questioning but also its functional equivalent, such as 'any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." United States v. Hull, 419 F.3d 762, 767 (8th Cir. 2005) (quoting Rhode Island v. Innis, 466 U.S. 291, 300–01 (1980)).

A defendant may waive their rights, "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444.

---

[8] Miranda v. Arizona, 384 U.S. 436 (1966).

9

### B. Analysis

As noted above, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury, 511 U.S. at 322 (quoting Miranda, 384 U.S. at 444). To be subject to suppression under Miranda, a statement must be made while in custody and in response to interrogation. United States v. McGlothen, 556 F.3d 698, 701 (8th Cir. 2009) (citing United States v. Londondio, 420 F.3d 777, 783 (8th Cir. 2005)).

It is undisputed that law enforcement's express questioning of Defendant on October 10, 2017, constituted interrogation. It is also undisputed that Defendant was in custody during the October 10, 2017, interview when he made the statements he now seeks to suppress. (See, Gov't's Response to Def.'s Mot. to Suppress Statements, [Docket No. 32], at 2) ("There is no doubt that the defendant was subject to custodial interrogation that required a Miranda warning."). The record also clearly demonstrated that Defendant was read a Miranda warning before the interview began, and he both verbally and in writing acknowledged he understood the rights warning. The Advice of Rights form signed by Defendant represents a waiver of those rights.

Accordingly, the only issue now before the Court regarding Defendant's October 10, 2017, interview is whether Defendant's waiver of his rights was made intelligently, knowingly, and voluntarily.

Before a statement procured through custodial interrogation can be admitted in court, the Government must demonstrate that a defendant's wavier of his rights was made intelligently, knowingly, and voluntarily. Miranda, 384 U.S. at 444, 475. The validity of a Miranda waiver requires consideration of two distinct inquiries, namely whether the waiver was voluntary "in the

10

sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception[,]" and whether the waiver was knowingly and intelligently made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011) (internal citations omitted) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). "The government has the burden of proving the validity of the Miranda waiver by a preponderance of the evidence." United States v. Haggard, 368 F.3d 1020, 1024 (8th Cir. 2004).

1. Voluntariness

Courts assess whether a waiver of rights pursuant to Miranda was made voluntarily by considering "the conduct of law enforcement officials and the suspect's capacity to resist any pressure." United States v. Contreras, 372 F.3d 974, 978 (8th Cir. 2004). The United States Supreme Court has previously explained "that coercive police activity is a necessary predicate to . . . finding that a confession is not 'voluntary,'" Colorado v. Connelly, 479 U.S. 157, 167 (1986), and the Eighth Circuit has read that holding to mean "that police coercion is a necessary prerequisite to a determination that a waiver was involuntary and not as bearing on the separate question whether the waiver was knowing and intelligent." United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998) (quoting United States v. Bradshaw, 935 F.2d 295, 299 (D.C. Cir. 1991)).

In determining whether a waiver was made voluntarily, a court "looks at the totality of the circumstances and must determine whether the individual's will was overborne." United States v. Syslo, 303 F.3d 860, 866 (8th Cir. 2002). In considering the totality of the circumstances, a court reviews whether the statement was "extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for

self-determination critically impaired." United States v. Sanchez, 614 F.3d 876, 883 (8th Cir. 2010) (internal quotation marks and citations omitted). "More specifically, [a court] consider[s], among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." Id. (citing Sheets v. Butera, 389 F.3d 772, 779 (8th Cir. 2004)).

Defendant argues that his waiver of rights pursuant to Miranda was not voluntary because it was obtained in a coercive manner. Defendant contends that his waiver was involuntary because of the "coercive custodial environment" of the vehicle in which he was placed for the interview, because he was handcuffed, "surrounded by law enforcement" inside the vehicle, because the interview took an hour and forty-four minutes during which he maintained his innocence for the first fifty minute, because SA Nevala "strongly suggested the degree of influence he had with the prosecutor and even the judge in sentencing outcomes," and because law enforcement in the interview had a "lack of interest" in Defendant's "disclosure of another person who might legitimately be an investigative target in this case." (Def.'s Mem., [Docket No. 31], at 6–7). Defendant contends that these coercive circumstances taken together overbore his will rendering involuntary his waiver of rights pursuant to Miranda. (Id.)

The Court's independent review of the audio recording of the October 10, 2017, interview indicates that the officers did not engage in any threatening or coercive tactics. See, United States v. Mims, 567 F. Supp. 2d 1059, 1080 (D. Minn. 2008) (holding Miranda waiver voluntary where, among other factors, interview was conducted in a reasonable, conversational tone); see also, United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 1995) (concluding no coercive tactics were used where, among other things, officers made no threats or promises to the defendant).

Although Defendant argues his will was overborn because of the "coercive custodial environment" of the vehicle in which he was placed for the interview and because he was handcuffed and "surrounded by law enforcement" inside the vehicle, there is no indication in the record that being handcuffed in the vehicle with the officers present intimidated Defendant or hindered Defendant's capacity to resist pressure. Defendant's repeated refusal to admit to the allegations of which SA Nevala accused him—in the face of SA Nevala expressing to Defendant several times that law enforcement had no reason to disbelieve the children and the officers thought Defendant was not telling the whole truth—is "itself some indication of Defendant's personal resolve and that his will was not overborne by" the environment of the vehicle. See, United States v. Clausen, No. 16-cr-256 (MJD/LIB), 2017 WL 1483525, at *8 (D. Minn. Feb. 27, 2017), report and recommendation adopted, No. 2017 WL 1483392 (D. Minn. Apr. 25, 2017). Defendant fails to cite to any, and the Court finds no, caselaw indicating that the environment created by placing a defendant—even a handcuffed defendant—in the front seat of a vehicle with three officers during an interview constitutes a per se coercive environment which overbears the will of the defendant. Defendant being placed in handcuffs is not determinative of the voluntariness of his waiver. See, United States v. Comstock, 531 F.3d 667, 677 (8th Cir. 2008) (finding that the use of handcuffs was not determinative of the voluntariness of consent to search); see also, Unites States v. Chaidez, 906 F.2d 377, 382 (8th Cir. 1990) (providing that "even persons who have been arrested and are in custody can voluntarily consent to a search"). Moreover, Courts have found a defendant being placed in the front seat and/or being handcuffed in front of their body more indicative of voluntariness of a waiver than being placed in the backseat of a vehicle and/or being handcuffed behind their body. See, Clausen, 2017 WL

1483525, at *8 ("Although, Defendant was restrained with handcuffs, he was restrained with his hands in front of his body, and he was allowed to sit in the front seat of the police vehicle.").

Furthermore, the Court finds Defendant's assertion that "[t]he oppressiveness of the environment inside the SUV is readily apparent by [Defendant's] statements on two separate occasions about how hot it was inside the vehicle" unpersuasive as the assertion is unsupported by the factual record now before the Court. While Defendant did tell SA Nevala that it was hot in the vehicle, SA Nevala agreed it was warm, and he immediately turned on the air condition in the vehicle to cool the vehicle and alleviated Defendant's discomfort. (See, Gov't Ex. 1 at 43:20–44:03). Moreover, any assertion that the environment inside the car was coercive to the point that Defendant's will was overborne is mitigated by the fact that Defendant requested and was allowed to make two separate phone calls to persons of his choosing during the course of the interview.

Defendant also argues that his will was overborn reasoning the interview was impermissively coercive because the interview took an hour and forty-four minutes during which he maintained his innocence for the first fifty minute of the interview. Courts have, however, found interviews lasting substantially longer than an hour and forty-five minutes were not coercive in their duration. See, e.g., Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993) (finding six-hour interview did not render confession involuntary); see also, United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 1995) (noting that interrogation lasting more than two hours was not coercive in duration). Likewise, SA Nevala's continuing questioning of Defendant while Defendant maintained his innocence for the first fifty minutes of the interview does not constitute a coercive tactic. See, Jenner, 982 F.2d at 334 ("It was likewise permissible to elicit further statements by claiming not to believe [defendant's] denials."); see also, Berghuis v.

14

Thompkins, 560 U.S. 370, 385–87 (2010) (finding that law enforcement's continued questioning of a defendant who remained silent for two hours and forty-five minutes was permissive and the defendant had not actually invoked his right to remain silent). Similarly, Defendant's becoming emotionally upset on occasion during the interview does not indicate that he was in a coercive environment. See, Id.

The same is true for Defendant's assertion that his will was overborn because law enforcement in the interview had a "lack of interest" in Defendant's "disclosure of another person who might legitimately be an investigative target in this case." During the interview, Defendant asserted that the children were told what to say to law enforcement by Janet; he accused the children's grandfather of inappropriate actions around the children, as well as, making the children dress inappropriately; and he suggested that a foster child who was previously in the home may have sexually assaulted the children. Despite Defendants contention that law enforcement had a "lack of interest" in these disclosures, SA Nevala addressed these assertions during the interview. Regarding Defendant's assertion about Janet, SA Nevala permissibly told Defendant that SA Nevala did not believe that Janet had told the children what to say in the interview, and he told Defendant he had no reasons to disbelieve the children. See, Id. In similar fashion, SA Nevala indicated to Defendant that he did not believe the foster child was who the alleged victim children were speaking about in their interview because the children gave detailed account of what Defendant allegedly did to them, and they said it was Defendant. See, Id. Regarding the accusations against the children's grandfather, SA Nevala at least twice clarified with Defendant the name of the children's grandfather and asked details about the grandfather's conduct around the children. These actions by SA Nevala do not constitute a "lack of interest" in other possible "investigative target[s] in this case."

Defendant next argues that his will was overborne by coercive tactics because SA Nevala strongly suggested the degree of influence he had with the prosecutor and even the judge in favorable sentencing outcomes. However, the record does not reflect that SA Nevala "strongly suggested" he had an influence over the sentencing outcomes in the present case. (See, Gov't Ex. 1 at 44:03–54:12). Instead, SA Nevala told Defendant that SA Nevala would tell the prosecutor if Defendant cooperated, and he would tell the prosecutor about Defendant's history of being sexually abused as a minor. (Id.). SA Nevala then told Defendant that the prosecutor and judge would look at that information, and cooperating could be more beneficial than not cooperating. (Id.). SA Nevala also told Defendant, however, that he couldn't "put words in the judge's mouth, and that "at the end of the day its completely up to the judge and the judge can say no. I'm not going to give Donald any consideration and throw the book at you." (Id.). Moreover, although SA Nevala told Defendant he had people in the past who had done sentences as low as five or ten years or even not a "a day in jail," NA Nevala told Defendant he wasn't saying that even the five or ten year sentence "would happen with a case—a child sex case like this," and he specifically told Defendant that not spending a day in jail probably wasn't an option "because in [Defendant's] case chances are, no matter how this goes, you're probably going to end up doing some time in jail." (Id.). In any event, an implication that cooperation may lead to leniency or even "a promise of leniency does not necessarily make a statement involuntary." United States v. Astello, 241 F.3d 965, 968 (8th Cir. 2001).

Throughout the interview, SA Nevala and SA Montgomery maintained a conversational tone and made no threats or promises to Defendant. Further, the Court's review of the audio recording of the interview shows that Defendant spoke willingly, understood what was being asked of him, responded appropriately to the question presented, and was able to resist

16

accusatory questions. Nothing in the record now before the Court indicates that anything about Defendant's maturity, education, physical condition, or mental condition critically impaired Defendant's capacity for self-determination.

Based on the foregoing, and under the totality of the circumstances, the Court concludes that Defendant's waiver of his rights on October 10, 2017, was voluntary.

2. Knowing and Intelligent

Next, the Court must consider whether Defendant's waiver of his rights was knowingly and intelligently made. Vinton, 631 F.3d at 483. The evidence in the record regarding Defendant's understanding of his rights and presence of mind during the October 10, 2017, interview consists of the audio recording of the interview and the testimony of SA Nevala.

Defendant argues that "the government has failed to establish that Agent Nevala's cursory reading of the Miranda advisory was sufficient to inform [Defendant] of the rights he possessed and the consequences of abandoning them." (Id. at 5). Specifically, Defendant contends SA "Nevala's explanation of Miranda and the waiver form ('I think Paul already went over your advice, rights and I'll just have you—I'll read this quick and have you sign it. It's the same thing, just a federal form here.' Agent Nevala then read through a pre-written set of Miranda warning and concluded with 'Just sign right there.") mislead [Defendant] into believing that his signature was required, not voluntary." (Id.). Therefore, Defendant argues, his waiver was "neither knowing nor deliberate and for this reason, should be suppressed." (Id.).

In the present case, the Government offers sufficient evidence for the Court to determine that Defendant's waiver of his rights on October 10, 2017, was knowing and intelligent.

Considering the totality of the circumstances, the Court's independent review of the audio recording of the October 10, 2017, interview indicates that Defendant appeared to fully

17

comprehend the conversation, understood the situation, understood the questions being asked of him, and provided contextually appropriate answers. Defendant's understanding and comprehension of the situation was demonstrated when he resisted SA Nevala's assertions that Defendant was not telling the whole truth or that Defendant had done more than he admitted. The audio recording, further, provides that SA Nevala read Defendant the Miranda warning aloud, handed Defendant a written copy of the Miranda warning to review, allowed Defendant time to review the written Miranda warning, and after first verbally indicating that he understood the rights read to him, Defendant signed the Advice of Rights waiver form before SA Nevala began actually interviewing Defendant. The signing of such a form "carries a significant weight in determining whether his waiver was knowing and intelligent." United States v. Gallardo, 495 F.3d 982, 991 (8th Cir. 2007) (citing North Carolina v. Butler, 441 U.S. 369, 373 (1979)). The weight to be given to Defendant signing this Advice of Rights form is bolstered by the fact that SA Nevala read aloud the rights on the form to Defendant before handing him the form, that SA Nevala specifically asked Defendant if he had any question and if he understood the form, and as already indicated, that Defendant not only signed the form but also verbally indicated that he understood the rights SA Nevala had read aloud before voluntarily answering any questions.

Furthermore, at the motions hearing, SA Nevala offered testimony that Defendant, at the time of the interview, appeared physically normal, responded appropriately to questions presented, appeared fine psychologically without any indication of mental health disabilities, and that Defendant did not appear to be under the influence of any drugs or alcohol.

Defendant's argument that his waiver is neither knowing or deliberate because SA Nevala's "cursory reading Miranda advisory was" insufficient to advise Defendant of his rights or the consequences of abandoning them, and it "mislead" Defendant "into believing that his

signature" on the Advice of Rights form "was required, not voluntary," is mitigated by the actual audio record now before the Court. The Court's independent review of the audio recording of the October 10, 2017, interview indicates that SA Nevala read the Advice of Rights form aloud in its entirety at a calm, understandable pace, and he gave Defendant time to review the written form before Defendant signed it. SA Nevala also asked Defendant if he had any question and if he understood his rights to which Defendant verbally responded "I understand," and he then signed the waiver form. Even if Defendant had not signed the form, his actions—of answering questions cooperatively and without hesitation—after he was given time to review the form imply that he understood his rights and he waived those rights. See, Butler, 441 U.S. 369 (holding that a waiver of rights pursuant to Miranda need not be explicit but may be inferred from the actions and words of a person being interrogated and such a waiver "is usually strong proof of the validity of that waiver").

Therefore, under the totality of the circumstances—including the consideration of Defendant's own actions and words—the Court concludes that Defendant's waiver of his rights at the October 10, 2017, interview was also knowing and intelligent.

Based on the foregoing, the Court recommends **DENYING** Defendant's Motion to Suppress Statements. [Docket No. 24].

### III. CONCLUSION

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1. Defendant's Pretrial Motion to Suppress Statements, [Docket No. 24], be **DENIED**.



Dated: February 6, 2018                                         s/Leo I. Brisbois
                                                                Leo I. Brisbois
                                                                U.S. MAGISTRATE JUDGE


### N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.